UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOSEPH G. WOOD,
Inmate No. 894702,
     Plaintiff,
vs.                          Case No.: 3:20cv5492/MCR/EMT

MARSHA NICHOLS, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on Defendants' motion for summary judgment with separately-filed exhibits (ECF Nos. 35–36), Plaintiff's response (ECF No. 40), and Defendants' reply (ECF No. 41). The case was referred to the undersigned magistrate judge for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the undersigned recommends Defendants' motion be granted.

I.    BACKGROUND[1]

_____

[1] The facts set forth below are derived from Plaintiff's verified amended complaint, which is the operative pleading in the case (ECF No. 6).

Plaintiff is an inmate of the Florida Department of Corrections (FDOC), currently confined at Hamilton Correctional Institute Annex (*see* ECF No. 43 at 2). Plaintiff was confined at Blackwater River Correctional Facility (BRCF) at the time of the events giving rise to his claims. Plaintiff names three Defendants in the amended complaint—Marsha Nichols, A.R.N.P.; George J. Semple, D.O.; and Charles Maiorana, Warden. Plaintiff alleges Defendants were deliberately indifferent to his serious medical need in violation of the Eighth Amendment to the United States Constitution.

Specifically, Plaintiff alleges that on July 9, 2019, while returning to his housing unit, he slipped in a puddle of water and landed on his right arm (ECF No. 6 at 8). Other inmates helped him to his feet and then to his bed (*id.*). Six days later, on July 15, Plaintiff awoke with "severe pain due to swelling in [the] right arm" (*id.*). He submitted an emergency medical request (*id.*). Defendant Nichols evaluated Plaintiff and ordered x-rays, which were conducted the same day and revealed a "comminuted colles fracture of the right Distal Radius" (*id.*). Nichols referred Plaintiff to an orthopedic doctor, Erwin Bennett, who, in turn, referred Plaintiff to a hand specialist, Dr. James Piorkowski (*id.* at 9). Plaintiff says he had an appointment with Dr. Piorkowski that was rescheduled—purportedly due to safety concerns

stemming from the weather—and that he did not see Dr. Piorkowski until seven and a half weeks after the injury occurred (*id.*).[2]

Plaintiff claims Dr. Piorkowski advised his daughter that "the reason that he could not properly repair his injury was due to [a] failure to bring Plaintiff to his originally scheduled appointment" and that Dr. Piorkowski contacted the prison several times about transporting Plaintiff to his appointment and was informed the prison was too busy (*id.*).  Plaintiff says that by the time he saw Dr. Piorkowski, "[t]he injury had already improperly healed and . . . due to Plaintiff's age and health, [Dr. Piorkowski] did not want to risk the Plaintiff's health by re-breaking his arm so that it could be properly set" (*id.*).

Plaintiff contends that once the severity of his injury was apparent, Nichols should have arranged for him to be transported to a local hospital so he "could receive adequate treatment . . . and [have his] arm properly set" (ECF No. 6 at 8). Plaintiff contends Nichols failed to do so, refused to prescribe pain medication, and "also neglected to schedule an orthopedics Doctor [to] examine [his] injury until one (1) month after the injury had occurred" (*id.*).

---

[2] As set forth *infra*, Plaintiff's original appointment with Dr. Piorkowski was scheduled for August 20, 2019; it was rescheduled to August 29, 2019.

Plaintiff says Dr. Semple was Nichols' immediate supervisor and, as such, was responsible for ensuring he received proper care, which he failed to do (*id.*). Plaintiff alleges Warden Maiorana had care, custody, and control over him and "[f]irst and foremost, he should have made sure that wet floor signs [were] properly displayed and since one of his female staff witnessed the Plaintiff's slip and fall, but failed to write up an incident report or have the Plaintiff sent to medical for an evaluation" (*id.* at 8–9). Plaintiff also maintains it was the warden's responsibility to ensure inmates were transported to medical appointments and received proper medical care and that Warden Maiorana "neglected to perform his duty in this regard" (*id.* at 9). In Plaintiff's view, "[a]ll of these mishaps fall back on the warden" (*id.*).

Plaintiff asserts claims under the Eighth Amendment for deliberate indifference to a serious medical need. As relief, he seeks a declaratory judgment along with $10,000.00 in compensatory damages against Nichols, $20,000.00 in compensatory damages against Semple, $30,000.00 in compensatory damages against Maiorana, and $50,000.00 in punitive damages against all Defendants, jointly (ECF No. 6 at 11–12). He sues Nichols and Semple in their individual and

official capacities but does not indicate the capacity in which he sues Maiorana (*id.* at 2–3).

## II.     DISCUSSION

### A.     Standard of Review

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See id.*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (noting Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers, or other materials on file, designate specific facts showing there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

"Typically, the nonmoving party may not rest upon only the allegations of his pleadings . . . but must set forth specific facts showing there is a genuine issue for

trial." *Howard v. Memnon*, 572 F. App'x 692, 694 (11th Cir. 2014). "A *pro se* plaintiff's complaint, however, if verified under 28 U.S.C. § 1746, is equivalent to an affidavit, and thus may be viewed as evidence." *Id.* Evidence presented by the nonmoving party in opposition to a motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999). The nonmoving party nevertheless still bears the burden of coming forward with sufficient evidence of every element he must prove. *See Celotex Corp.*, 477 U.S. at 317. A motion for summary judgment should be granted only if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

B.    Defendants' Motion

Defendants filed a motion for summary judgment, arguing that Plaintiff failed to exhaust his administrative remedies before filing suit, Plaintiff's claims for deliberate indifference to a serious medical need fail as a matter of law, and Defendant Maiorana is entitled to qualified immunity. The undersigned will address each argument below.

1.    Failure to exhaust administrative remedies

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes; allege excessive force or some other wrong; or seek injunctive relief, monetary damages, or both.  *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).

Exhaustion of available administrative remedies is a mandatory pre-condition to suit.  *See Booth v. Churner*, 532 U.S. 731, 739 (2001) ("The 'available' 'remed[y]' must be 'exhausted' *before* a complaint under § 1983 may be entertained.") (emphasis added); *see also Porter*, 534 U.S. at 524–25 ("Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.").  Moreover, "the PLRA exhaustion requirement requires *proper* exhaustion."

*Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (emphasis added).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.

In Florida, the procedural rules an inmate must follow in order to properly exhaust administrative remedies are promulgated by the FDOC and set forth in the Florida Administrative Code. *See* Fla. Admin. Code Chapter 33-103 (Inmate Grievances).  The FDOC's grievance procedure requires an inmate to: (1) file an informal grievance with a designated prison staff member, (2) file a formal grievance at the institutional level with the warden's office, and (3) submit an appeal to the Office of the Secretary of the FDOC (Secretary) through the Bureau of Policy Management and Inmate Appeals in the FDOC's Central Office.  *See* Fla. Admin. Code rr. 33-103.005 to 33-103.007; *see also Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010); *see Thompson v. Nichols*, No. 3:11cv423/RV/CJK, 2015 WL 1484807, at *3 (N.D. Fla. Mar. 31, 2015).  If an inmate is filing a medical grievance, he may bypass use of an initial informal grievance and begin with a formal grievance to the institutional warden.  *See* Fla. Admin. Code R. 33-103.006(3)(e).  An inmate may initiate a direct grievance with

the Office of the Secretary only in cases of emergency, reprisal, HIPAA violations, and other limited circumstances set forth in R. 33.103.007(6). In such instances, the direct grievance must indicate that it "concerns either an emergency or is a grievance of a reprisal . . . [or] HIPAA" and "clearly state the reason for by-passing the informal and formal grievance steps of the institution or facility[.]" *Id.*

The rules also establish strict timeframes in which inmates must file grievances. Grievance appeals to the Office of the Secretary "[m]ust be received within 15 calendar days from the date the response to the formal grievance is returned to the inmate." R. 33-103.011(1)(c). To eliminate issues with mailing, the rules make provisions for appeals to the Secretary to be received locally at the institution/facility. *See* R. 33-103.006(8).

In support of their motion, Defendants attached the declaration of Rolando Bethea, grievance coordinator at BRCF (ECF No. 35-6). In the declaration, Bethea states that between July 1, 2019, and November 20, 2019, the date Plaintiff was transferred to another facility, Plaintiff filed one formal grievance (No. 1910-185-063) and one informal grievance (No. 185-1910-0170) (*id.* at 1). According to Bethea, BRCF has no record of Plaintiff filing an appeal to the Office of the Secretary while confined at BRCF (*id.*).

In grievance No. 1910-185-063, which Plaintiff submitted to Warden Maiorana on October 6, 2019, Plaintiff set forth allegations regarding lack of adequate medical treatment for his fractured wrist (ECF No. 40 at 76–77). He referenced Defendant Nichols and a "Mr. Smith," but he did not mention Dr. Semple or Warden Maiorana. Defendants argue Plaintiff was required to submit the grievance on or before August 6, 2019, twenty days from July 17, 2019, the date on which Plaintiff claims Nichols failed to provide adequate treatment (ECF No. 36 at 20). Considering Plaintiff submitted the grievance two months later, Defendants argue the grievance was untimely (*id.*).

Dr. Semple nevertheless responded to the merits of the grievance on October 23, 2019, as follows:

> Review of your record reveals that the medical evaluation and care provided to you for the injury to your arm was appropriate and adequate. You were referred to specialists for your injury. The recommendations made by the specialists have been followed by our clinician. If you feel you want to or need to be re-evaluated, sign up for sick call.

(ECF No. 40 at 78). Warden Maiorana signed off on Dr. Semple's response (*id.*).

Plaintiff had fifteen days from receipt of Dr. Semple's response in which to appeal the denial to the Secretary (*see id.* at 60). Plaintiff has pointed to no evidence

indicating he did so.[3]  Plaintiff, therefore, has failed to demonstrate he exhausted his administrative remedies before filing suit.  Defendants thus are entitled to summary judgment as a matter of law on Plaintiff's claims.

## 2.    Deliberate indifference to a serious medical need

Even if Plaintiff had properly exhausted his administrative remedies, his claims nevertheless fail as a matter of law.  Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."  *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).  "Medical treatment violates the Eighth Amendment," however, "only when

---

[3] Plaintiff indicates in his amended complaint that he filed grievances at the facility level and with the Secretary and that copies were attached as exhibit E to the amended complaint (*see* ECF No. 6 at 14).  There is no exhibit attached to the amended complaint (*see* ECF No. 6), although Plaintiff attached a number of exhibits, including grievances and responses to grievances, to the initial complaint (*see* ECF No. 1).  Because Plaintiff filed an amended complaint, the initial complaint, and all exhibits thereto, is no longer the operative pleading.  *See, e.g., Nieman v. Nat'l Claims Adjusters, Inc.*, 775 F. App'x 622, 624 (11th Cir. 2019) ("As a general rule, an amended complaint supersedes any prior complaint and nullifies its exhibits.").  Nevertheless, even assuming Plaintiff filed the grievances attached to his initial complaint with the Secretary, as the responses thereto indicate, the grievances were not properly filed and thus were returned to Plaintiff without action (*see* ECF No. 1, Exhs.; *see also* ECF No. 36 at 20, 22 (Defendants' acknowledgement that Plaintiff submitted a number of grievances directly with the Secretary—and explanation that the grievances were not properly filed and thus returned to Plaintiff without action).  Plaintiff therefore did not fully exhaust his administrative remedies.

it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'   Mere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Id.* at 1505 (internal citations omitted).

To prevail on an Eighth Amendment deprivation of medical care claim, an inmate must prove three elements.   First, the plaintiff must demonstrate "an objectively serious medical need" so grave that, "if left unattended, [it] poses a substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal marks, alterations, and citations omitted).   "[A] serious medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal marks omitted).   The second element requires "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor*, 221 F.3d at 1258.   "To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" *Id.* (quoting *Estelle*, 429 U.S. at 105).   The official's response must have been so inadequate as to "constitute an unnecessary and wanton infliction of

pain" and not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Id.* The deliberate-indifference standard is akin to "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994); *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020). To satisfy the final element of an Eighth Amendment deprivation of medical care claim, a plaintiff must show the official's deliberate indifference caused his injury. *Taylor*, 221 F.3d at 1258; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (reiterating the elements of an Eighth Amendment claim).

Here, Plaintiff has failed to demonstrate a genuine issue of material fact with regard to each element of a deliberate indifference claim. Plaintiff's claim is based largely, if not entirely, on alleged delays in treatment—most notably, when his initial appointment with Dr. Piorkowski was rescheduled from August 20 to August 29. While a delay in medical treatment can constitute deliberate indifference, *see, e.g., Goebert v. Lee Cty.*, 510 F.3d 1312, 1330 (11th Cir. 2007) ("As for unnecessary delays in treatment constituting deliberate indifference, we [have] held . . . that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-

threatening condition or an urgent medical condition that would be exacerbated by delay") (internal marks and citation omitted), in this instance, Plaintiff has wholly failed to demonstrate that any Defendant caused—or even was aware of—the delay. Indeed, Plaintiff has not shown that Nichols, Semple, or Maiorana made—or was aware of—the decision to reschedule the appointment with Dr. Piorkowski.  Even if any Defendant was aware of—or had been involved in—rescheduling the appointment, *at most*, the nine-day delay, which was due to safety concerns,[4] constituted negligence, which is insufficient to establish liability under the Eighth Amendment.  *See Rivas v. Freeman*, 940 F.2d 1491, 1496 (11th Cir. 1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. section 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to constitutional rights.  The negligent act of an official causing unintended loss or injury to life, liberty or property does not implicate due process rights under 42 U.S.C. § 1983.") (internal marks omitted).  Indeed, Plaintiff has adduced no evidence whatsoever that any Defendant intended to delay his treatment or was aware that his condition would be

---

[4] The summary judgment record establishes the appointment was rescheduled because of safety concerns—specifically, "weather and interstate issues" (ECF No. 35-5 at 9).

exacerbated by such a delay.  And Plaintiff has adduced no evidence that the delay, in, fact, exacerbated his condition or harmed him in any other way.  The only evidence Plaintiff has offered in that regard—a declaration from his daughter in which his daughter reiterates alleged statements made by Dr. Piorkowski and his own declaration repeating his daughter's statements—constitutes inadmissible hearsay.

Moreover, the record shows Plaintiff received extensive medical treatment for the fractured wrist.  As Defendants set forth in their motion, on July 15, 2019, six days after the injury occurred but the same day Plaintiff woke up experiencing "severe pain" and first sought care, Plaintiff submitted an emergency medical request and was seen by K. Bartlett, L.P.N. (ECF Nos. 36 at 2, 35-5 at 31–32; 35-2 at 3, 35-3 at 2).  Plaintiff complained of swelling to his right arm (ECF Nos. 35-5 at 31, 35-2 at 3, 35-3 at 2)*.*  Nurse Bartlett noted pulse distal to the injury, the injury site was pink and warm, capillary refill in less than two seconds, no extremity numbness or tingling, no deformity, and that Plaintiff could move his right arm (*id.*). Swelling was moderate, skin was intact, and there was no bleeding (*id.*).  Nurse Bartlett indicated possible fracture and notified Nichols (*id.*).  Nurse Bartlett advised

Plaintiff to keep his right arm elevated as much as possible over the next forty-eight to seventy-two hours and issued a sling (*id.*).

Nichols ordered x-rays of Plaintiff's right hand, wrist, elbow, forearm, and shoulder on July 15, 2019, which were completed the same day (ECF Nos. 35-5 at 26, 35-2 at 3, 35-3 at 2–3). The x-rays showed a healed Colles' type fracture of the distal right radius with loss of the volar tilt of the plane of radiocarpal articulation in the right hand; a comminuted Colles' fracture of the distal right radius in the wrist; and no fracture in the forearm, elbow, or shoulder (ECF Nos. 35-5 at 21–25, 35-2 at 3–4, 35-3 at 2–3). Nichols reviewed the x-rays on July 17 and instructed Nurse Bartlett to put a splint on Plaintiff's arm, which Nurse Bartlett had already done (ECF Nos. 35-5 at 21–25, 30; 35-2 at 4; 35-3 at 3). Nichols requested to see Plaintiff the following morning for purposes of scheduling an appointment with an orthopedic doctor (ECF Nos. 35-5 at 30, 35-2 at 4, 35-3 at 3).

When Nichols saw Plaintiff the next day, on July 18, she noted Plaintiff was wearing a splint, complained of pain in the right arm, and had no bruising but some swelling in the fingers (ECF Nos. 35-5 at 30, 35-2 at 4, 35-3 at 4). She assessed fracture of the right radius (*id.*). The plan was for Plaintiff to continue with the splint, take Tylenol for pain, have an orthopedic consult, and elevate the extremity

(*id.*).  Nichols issued a pass, the nature of which is not entirely clear, and completed

the request form for an orthopedic consultation, to which Plaintiff consented (ECF

Nos. 35-5 at 30, 33; 35-2 at 4–5; 35-3 at 3–4;).  The consult form was provided to J.

Johnson, M.R.C., on July 18 and entered into the electronic records system on July

22 (ECF No. 35-5 at 29, 33; 35-2 at 5; 35-3 at 4).  An appointment with Erwin

Bennett, M.D., was scheduled for August 8 (*id.*).

When Dr. Bennett saw Plaintiff on August 8, he noted Plaintiff was a 71-year-

old male with a right distal radius fracture resulting from a slip and fall accident on

July 8, which had been treated with a splint (ECF Nos. 35-5 at 33–34; 35-2 at 5; 35-

3 at 4).  Dr. Bennett assessed right intraarticular distal radius fracture, referred

Plaintiff to a hand specialist, and prescribed a splint (*id.*).  Plaintiff saw Nichols later

that day, and Nichols noted Plaintiff was referred to a hand specialist, Dr. Piorkowski

(ECF Nos. 35-5 at 11, 19, 29; 35-2 at 5; 35-3 at 4–5).

On August 12, 2019, Plaintiff saw Nurse Von Oven, who noted a right arm

fracture with a splint and pending orthopedic consult scheduled for August 20 (ECF

No. 35-5 at 11, 19; 35-2 at 6; 35-3 at 5).  The next day, Nichols reviewed Dr.

Bennett's records (ECF Nos. 35-5 at 500–01, 35-2 at 6, 35-3 at 5).  Several days

later, on August 16, L. Savioe, R.N., noted Plaintiff had an appointment with a hand

specialist and was wearing a sling (ECF Nos. 35-5 at 10, 35-2 at 6, 35-3 at 5).  The
orthopedic appointment scheduled for August 20 was rescheduled to August 29 due
to "weather and interstate issues" (ECF Nos. 35-5 at 9, 35-2 at 6, 35-3 at 5).

Upon examining Plaintiff on August 29, Dr. Piorkowski diagnosed a distal
radius fracture but indicated Plaintiff did not need a splint; he scheduled a follow-up
visit in four weeks (ECF Nos. 35-5 at 20, 35-2 at 6).  Dr. Piorkowski indicated that
x-rays of the right wrist showed age-related degenerative changes throughout the
hand and a displaced distal radius fracture with some shortening and radial
translation of the  metaphyseal segment (ECF Nos. 35-5 at 17–18, 35-2 at 6).
According to Dr. Piorkowski, Plaintiff had a loss of about ten degrees from neutral
of volar tilt (*id.*).  Dr. Piorkowski assessed distal radius fracture, right, that was
conservatively treated at seven and a half weeks and showing signs of healing with
no tenderness, consistent with a "continued" fracture (*id.*).  The plan was to continue
with nonoperative treatment and take Plaintiff out of the splint to start range of
motion exercises (*id.*).  Dr. Piorkowski discerned no good reason to attempt
osteotomy surgery for correction at that time (*id.*).

Nichols reviewed Dr. Piorkowski's notes on August 29, 2019, and submitted
a request to schedule a four-week follow-up appointment (ECF No. 35-5 at 14).  J.

Johnson scheduled the appointment on September 12 (ECF Nos. 35-5 at 9, 35-2 at 7, 35-3 at 5).

Plaintiff submitted a sick call request on September 17; he saw a nurse two days later, who issued a six-month front cuff pass (ECF Nos. 35-5 at 7–8, 35-2 at 7, 35-3 at 5).  Plaintiff submitted another sick call request on September 22 (ECF Nos. 35-5 at 6, 35-2 at 7, 35-3 at 6).  The following day, he saw Nurse Hacker, who noted he complained that Tylenol did not help and rated his pain a seven on a ten-point scale (ECF Nos. 35-5 at 4, 35-2 at 7, 35-3 at 6).  Nurse Hacker also noted a "deformity not new," a history of right distal radius fracture, and that Plaintiff requested Mobic instead of Tylenol (*id.*).  Nurse Hacker directed Plaintiff to elevate his right arm higher than his heart and take 650mg of acetaminophen or 400mg of ibuprofen every four to six hours and return if he developed any new symptoms (ECF Nos. 35-5 at 5, 35-2 at 7, 35-3 at 6) ).  Nichols reviewed Nurse Hacker's notes and indicated Plaintiff was not to receive Mobic or Motrin due to kidney problems (ECF Nos. 35-5 at 4, 35-2 at 7, 35-3 at 6)).

Plaintiff saw Dr. Piorkowski for a follow-up appointment on October 1 (ECF Nos. 35-5 at 15–16, 35-2 at 7, 35-3 at 6).  Dr. Piorkowski indicated Plaintiff's wrist was not synovitic and that Plaintiff had "really quite good motion in both flexion

and extension" and that the wrist was soft and supple with no real fracture tenderness (ECF Nos. 35-5 at 16, 35-2 at 8, 35-3 at 7)  Dr. Piorkowski observed good finger motion with no crepitus and sensation intact to light touch in all fingers with a little bit of pain in the proximal forearm, which Dr. Piorkowski opined was muscular in nature (*id.*).  Dr. Piorkowski assessed a closed fracture of the distal end of the right radius with routine healing and malunited distal radius fracture with good function and minimal discomfort (*id.*).  Dr. Piorkowski released Plaintiff to full activity and again indicated there was no need for surgical treatment (*id.*).  Dr. Piorkowski noted, however, that he discussed with Plaintiff "some of the limitations he may have in the future," including the possibility of developing some posttraumatic arthritis, and that Plaintiff understood (*id.*).

On October 2, Nichols noted Dr. Piorkowski released Plaintiff to full activity, as tolerated, and indicated Plaintiff needed a follow-up appointment (ECF Nos. 35-5 at 3, 35-3 at 7).  When Nichols saw Plaintiff for the follow-up appointment on October 9, Plaintiff reported pain in the wrist when using his hand, which Plaintiff said had not healed well and was "going to have issues" (ECF Nos. 35-5 at 3, 35-2 at 8–9, 35-3 at 7).  Upon examination, Nichols noted no gross deformity and fingers

well intact (ECF Nos. 35-5 at 3, 35-2 at 9, 35-3 at 7).  She assessed radial fracture,

non-union, and issued a wrist support and pass (*id.*).

Plaintiff saw Nurse Hackier on October 22, who requested that Dr. Semple

renew Plaintiff's Health Services Profile, which Dr. Semple did based on a review

of Plaintiff's medical records and last year's form, indicating Plaintiff had low bunk

and low tier passes and was limited to no pushing, pulling, or lifting more than ten

pounds—restrictions that were in place before Plaintiff's injury (ECF Nos. 35-5 at

326, 581; 35-2 at 9).  Nichols completed a Health Services Profile on November 11

and noted no restrictions; she thus removed a hold (ECF Nos. 35-5 at 27).  Plaintiff

transferred out of BRCF on November 20 (ECF Nos. 35-5 at 43, 35-2 at 10).  Records

from Plaintiff's subsequent incarceration at Jefferson Correctional Institution and

Reception and Medical Center reflect he was assessed by medical staff at each

facility and not referred for additional orthopedic consultation (ECF Nos. 35-2 at 10,

¶ 48; 35-3 at 8, ¶ 40).

Based on the evidence of record, no reasonable jury could conclude that any

Defendant was aware of and disregarded a substantial risk of serious harm to

Plaintiff.  Indeed, there is no evidence that any Defendant "personally failed or

refused to provide Plaintiff with medical treatment or was responsible for any delay

in or denial of the provision of such treatment."  *Sealey v. Pastrana*, 399 F. App'x

548, 552 (11th Cir. 2010).  To the contrary, the unrefuted evidence demonstrates

Plaintiff received extensive medical treatment while confined at BRCF, from both

BRCF providers, including Nichols, and outside specialists.  Plaintiff thus has failed

to raise a genuine issue of material fact as to his deliberate indifference claims.

Plaintiff's claims against Warden Maiorana and Dr. Semple fail for an

additional reason.  Warden Maiorana indisputably was "not a medical professional,

nor directly involved in [plaintiff's] medical care;" thus, "to be liable under the

Eighth Amendment for deliberate indifference to [Plaintiff's] serious medical need,

[Plaintiff] must establish that [Warden Maiorana] was responsible for his

constitutional deprivation in a supervisory capacity."  *Sealey v. Pastrana*, 399 F.

App'x 548, 552 (11th Cir. 2010).  "When alleging deliberate indifference—medical

or otherwise—against a supervisor, a prisoner must show either that (a) the

supervisor personally participated in the alleged constitutional deprivation or (b)

there is a causal connection between the supervisor's actions and the alleged

constitutional deprivation."  *Id.*  "A causal connection may be established by

showing that: (i) the supervisor was on notice of a history of widespread abuse of

constitutional rights[] but failed to take corrective action; (ii) the supervisor had a

policy in place that condoned the alleged constitutional deprivation; or (iii) the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal marks omitted).

Plaintiff has adduced no evidence of Warden Maiorana's personal participation in his alleged constitutional deprivation or a causal connection between Warden Maiorana's alleged acts or omissions and the alleged deprivation. Although Warden Maiorana may have been familiar with Plaintiff and his medical issues, the only record evidence regarding Warden Maiorana's involvement in Plaintiff's medical treatment is Warden Maiorana signing off on Dr. Semple's response to Plaintiff's October 6 grievance, which indicated that a review of Plaintiff's medical records revealed Plaintiff had received adequate and appropriate medical treatment, including referrals to specialists, whose recommendations were followed. "[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." *Williams v. Limestone Cty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)). And Plaintiff has not alleged—much less adduced evidence—that Maiorana had policies in place

that condoned deliberate indifference to his medical needs, including policies regarding transportation of inmates to outside medical appointments.

Similarly, Plaintiff seeks to hold Dr. Semple liable based on the fact that he was Nichols' supervisor.  "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal marks and citation omitted); *see also Polk Cty. v. Dodson*, 454 U.S. 312 (1981); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  "The mere right to control, without any control or direction having been exercised and without any failure to supervise, is not sufficient to support 42 U.S.C. § 1983 liability." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 n.58 (1979). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted).

In *Douglas v. Yates*, 535 F.3d 1316 (11th Cir. 2008), the Eleventh Circuit specified the circumstances in which a causal connection can be shown sufficient to render a supervisor liable on a § 1983 claim, as follows:

> when a history of widespread abuse puts the responsible supervisor on
> notice of the need to correct the alleged deprivation and he fails to do
> so; when the supervisor's improper custom or policy leads to deliberate
> indifference to constitutional rights; or when facts support an inference
> that the supervisor directed the subordinates to act unlawfully or knew
> that the subordinates would act unlawfully and failed to stop them from
> doing so.

*Id.* at 1322 (citing *West v. Tillman*, 496 F.3d 1321, 1328–29 (11th Cir. 2007)).

Plaintiff makes no such allegations against Dr. Semple.

Moreover, to the extent Plaintiff has sued Defendants in their official capacities for damages, Defendants are immune from suit pursuant to the Eleventh Amendment, which bars suits for damages against state actors. *See, e.g., Gamble v. Florida Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1511 (11th Cir. 1986). Indeed, "[a]bsent a legitimate abrogation of immunity by Congress or a waiver of immunity by the state being sued, the Eleventh Amendment is an absolute bar to suit by an individual against a state or its agencies in federal court." *Id.; Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the

Fourteenth Amendment to override that immunity.") (citations omitted)).   A suit against a state employee in his or her official capacity is deemed a suit against the state for Eleventh Amendment purposes.   *Will*, 491 U.S. at 71; *Gamble*, 779 F.2d at 1512 (holding the Eleventh Amendment "will bar damage awards against state officers sued in their official capacities in suits brought in federal court pursuant to 42 U.S.C.A. § 1983.").   It is well settled that FDOC employees, including those contracted to manage and administer correctional institutions, are state actors. *See, e.g., Acevedo v. Thomas*, No. 4:19cv00262/WS/MAF, 2020 WL 7481308, at *2 (N.D. Fla. Nov. 18, 2020), *report and recommendation adopted*, No. 4:19cv262/WS/MAF, 2020 WL 7481283 (N.D. Fla. Dec. 18, 2020) ("At the time of the incident, the Defendants, prison correctional officers, were employees of the Florida Department of Corrections, a state entity entitled to Eleventh Amendment Immunity.   This immunity extends to Defendants."); *Baker v. Corizon Health*, No. 3:19cv561/TKW/EMT, 2019 WL 3642579, at *5 (N.D. Fla. July 26, 2019), *report and recommendation adopted*, No. 3:19cv561/TKW/EMT, 2019 WL 3616789 (N.D. Fla. Aug. 6, 2019), *appeal dismissed*, No. 19-13119-J, 2019 WL 6218806 (11th Cir. Oct. 10, 2019) ("A governmental entity having custody of an inmate bears an affirmative obligation to provide the inmate with adequate medical care.   Where the

government delegates that function to a private medical provider, and the private party voluntarily assumes it by contract[,] . . . the private party becomes a state actor within the meaning of § 1983.").  Any claim for damages against Defendants in their official capacities thus fails as a matter of law.[5]

III.    CONCLUSION

Construing the evidence in the light most favorable to Plaintiff, the undersigned finds there is no genuine issue of material fact and that Defendants are entitled to summary judgment as a matter of law.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Defendants' motion for summary judgment (ECF No. 36) be **GRANTED**.

2.    That all pending motions be DENIED as moot.

3.    That the clerk of court be directed to enter judgment accordingly and close the case.

---

[5] Defendants argue Warden Maiorana is entitled to qualified immunity with regard to any damages claim against him in his individual capacity.  Because the undersigned finds summary judgment appropriate on other grounds, the undersigned need not consider whether Maiorana—or any other Defendant—is entitled to qualified immunity against Plaintiff's claims.  *See Brennan v. Thomas*, 780 F. App'x 813, 822 (11th Cir. 2019).

Case No.: 3:20cv5492/MCR/EMT

At Pensacola, Florida this 31<u>st</u> day of August 2021.

<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>**Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.**</u>  A copy of objections must be served on all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.